UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NO.

## 00 - 4034
# CIV - LENARD

M SECURITIES AND INVESTMENTS,
INC., a Florida Corporation, d/b/a
HOWARD GARY & COMPANY,
                              Plaintiff,

**MAGISTRATE JUDGE
TURNOFF**

vs.                                    **COMPLAINT**

MIAMI-DADE COUNTY EXPRESSWAY AUTHORITY,
 MICHAEL ABRAMS AND PERCY R. AGUILA, Jr., individually
 and DAIN RAUSCHER, Inc. f/k/a
RAUSCHER PIERCE, REFNES, INC.,
jointly, Individually and severally.

         Defendants.
_____/

         Plaintiff, M. Securities and Investments, Inc., a Florida Corporation, d/b/a
HOWARD GARY & COMPANY & Company (hereinafter " HOWARD GARY &
COMPANY or PLAINTIFF"), sues Defendant, Miami- Dade County Expressway
Authority f/k/a Dade County Expressway Authority (hereinafter "The
EXPRESSWAY AUTHORITY") MICHAEL ABRAMS (hereinafter ABRAMS),
PERCY R. AGUILA, Jr. (hereinafter AGUILA), individually, and as agent for
DAIN RAUSCHER, Inc. f/k/a RAUSCHER PIERCE, REFNES, INC. and DAIN
RAUSCHER, Inc. f/k/a RAUSCHER PIERCE, REFNES, INC., (hereinafter
RAUSCHER) and alleges as follows:

### PARTIES

1. Plaintiff, M. Securities and Investments, Inc., d/b/a HOWARD GARY &
   COMPANY is a Florida Corporation with its principle place of business located
   in Miami-Dade County, Florida, formerly known as Metropolitan Dade County.

2. HOWARD GARY & COMPANY is a registered securities broker-dealer,
   registered with the Security and Exchange Commission. HOWARD GARY &
   COMPANY is a member of the National Association of Securities Dealers, Inc.,
   (NASD) and the Municipal Securities Rule making Board.

3. HOWARD GARY & COMPANY has been active as an underwriter of
   municipal bonds in Miami-Dade County and throughout the United States.

4. HOWARD GARY & COMPANY has, as its majority ownership, individuals who are African-American citizens of the United States of America.

5. Defendant, The Miami- Dade County Expressway Authority f/k/a Dade County Expressway Authority (hereinafter "The EXPRESSWAY AUTHORITY") is an independent agency of Miami Dade County of the State of Florida. At the relevant time period, it was governed by an Executive Director, and a thirteen member Board.

6. Defendants Michael Abrams and Percy R. Aguila, Jr. were, at all times material hereto residents of Miami- Dade County, Florida and are otherwise sui juris. At all times relevant, Abrams and Aguila were the managing agents for the Miami office of Defendant RAUSCHER which was the *FINANCIAL ADVISOR* for certain agencies of Defendant EXPRESSWAY AUTHORITY, in the oversight of the issuing of Municipal bonds, for it.

## JURISDICTION

7. This Court has jurisdiction over this matter as it arises under the Constitution of the United States, Article 1, §9, Clause 3 and the Statues of the United States, specifically, 28 USC §d1331, §1332, §1343 et. seq., and 42 U.S.C. §1981 and §1983 . Further, the amount in controversy exceeds $75,000.00, and there are numerous pendant State claims.

## GENERAL ALLEGATIONS

8. Pursuant to the procedures and requirements HOWARD GARY & COMPANY had been named as a member of one of authorized underwriting teams permitted, and contracted to participate as an underwriter in general obligation and revenue bonds issued by the Expressway Authority. In so naming HOWARD GARY & COMPANY to the team, the Expressway Authority entered into a contract with HOWARD GARY & COMPANY.

9. Prior to October, 1996, pursuant to the then relevant procedures, HOWARD GARY & Company's underwriting team, including Howard GARY & COMPANY individually, were selected by the Expressway Authority to serve as underwriters of certain bond issues. In fact, HOWARD GARY & COMPANY was included in the Preliminary Offering Circular(s) for certain bond issues.

10. The awarding of the underwriting contract is a public contract governed by State and Federal law in addition to Dade County Code Sections 2-10.6, 94-158 and 95-37.

11. Commencing September, 1996, after HOWARD GARY & COMPANY was erroneously named as a purported perpetrator of certain "alleged" wrongdoing, by the media, Defendant, RAUSHER, by and through its representative and managing agent for the DADE County area, Defendants ABRAMS and

AGUILA recommended to Defendant Expressway Authority to unlawfully exclude PLAINTIFF from ongoing Bond underwriting transactions for which HOWARD GARY & COMPANY had performed work, and for which HOWARD GARY & COMPANY had a contractual obligation to perform, on behalf of The Expressway Authority, on or about October 29, 1996. RAUSCHER and ABRAMS and AGUILA, as Financial Advisors endorsed the continuing exclusions of HOWARD GARY & COMPANY from the bond underwriting, of The Expressway Authority, thereafter.

12. Without any due process, The Expressway Authority followed Defendant, RAUSHER, and *Defendant ABRAMS and AGUILA's recommendation, who were acting within the Course and scope of their employment with Defendant RAUSCHER* and unlawfully excluded HOWARD GARY & COMPANY from participation, in those "deals", causing HOWARD GARY & COMPANY to suffer substantial damages.

13. The recommendation to its principal, Miami-Dade County, by ABRAMS and RAUSCHER to exclude Plaintiff, which resulted in Plaintiff's exclusion violated Plaintiff's rights to make and enforce contracts to the same degree as "white citizens".

14. Thereafter, The Expressway Authority attempted to exclude HOWARD GARY & COMPANY from all pending, and proposed Bond underwritings, in which HOWARD GARY & COMPANY would have been a participant. (See letter - Exhibit A)

15. The F.B.I. and the U. S. Attorney became aware that PLAINTIFF was being improperly damaged and denied the right to conduct business, and they recommended that HOWARD GARY & COMPANY be granted assistance, in the form of a stipend by the U. S. Dept. of Justice. (Exhibit B)

16. DADE, was then notified both orally, by F.B.I. agents, and subsequently by an Assistant United States Attorney, that HOWARD GARY & COMPANY was not a subject, or target of any federal investigation. On October 30. 1996, and November 15, 1996 The Expressway Authority and  ABRAMS, AGUILAR and RAUSCHER had specific knowledge of the fact that HOWARD GARY & COMPANY was not a target of any FBI investigation. ( Exhibits "C" & "D").

17. As a result of the letter and opinions of the office of the Dade County Attorney's office, HOWARD GARY & COMPANY was permitted to participate in a subsequent DADE COUNTY bond underwriting, where HOWARD GARY & COMPANY's participation had no adverse impact on the transaction.

18. In the sale of those bonds, even during the "firestorm" of negative press publicity, generated by the financial problems of the City of Miami, and the Port of Miami, for which HOWARD GARY & COMPANY was wrongfully implicated, in the media (*TRIAL BY PRESS*), those bonds sold with no adverse

impact on their price, nor their market acceptance, [the only two valid criteria for excluding HOWARD GARY & COMPANY's participation in the deals]. This was pointed out to the Authority, in a letter sent to The Expressway Authority by HOWARD GARY & COMPANY (Exhibit "E")

19. The City of Miami's financial problems were largely exacerbated and concealed by Defendant ABRAMS and Defendant RAUSCHER, who was the lead underwriter on a 1995 Bond issue, of the City of Miami, which ABRAMS, AGUILA and RAUSCHER *KNEW* was to create deficit financing and exacerbate the City of Miami's precarious financial condition. (Exhibit F—{sent via fax from RAUSCHER headquarters in Sarasota, Florida to ABRAMS, and AGUILA in RAUSCHER's Miami office, and then sent via fax to Manohar Suranna, the then Director of both Budget and Finance, for the City of Miami, and to the then City Manager, Ceasar Odio}). [ Exhibit E was only obtained during the trial in the legal proceeding, S.E.C. v City of Miami, et al, within the last 6 months.]

20. HOWARD GARY & COMPANY, without any ability to determine the above described private dealings, between RAUSCHER and ABRAMS and the officials, of the City of Miami had consistently advised the City of Miami, as its Co-Financial Advisor that pursuant to its legal obligations in their opinion, the City of Miami, in an effort to be financially prudent, should review and reduce its true expenses, since, HOWARD GARY & COMPANY had formally warned the City, as early as 1989, that were the City of Miami not change its spending habits, vis-à-vis its revenue that by 1996 it would have a $65,000,000.00 deficit. (Exhibit F).

21. Virtually none of those true details were actually portrayed in the press which was "flaying" of HOWARD GARY & COMPANY, nor was HOWARD GARY & COMPANY permitted to respond to these unlawful removals from the bond underwriting syndicates in a manner consistent with due process of law.

22. The possible removal of HOWARD GARY & COMPANY from the underwriting teams were based upon allegations that the continued inclusion of HOWARD GARY & COMPANY would create a negative financial impact to The Expressway Authority as a result of publicity associated with HOWARD GARY & COMPANY's cooperation with the Federal Bureau of Investigation in one of its ongoing investigations.

23. The denial of a "right to conduct business with a Government Agency must provide the protections of Administrative Due Process, codified in the administrative Procedures Acts of the Statutes of the State of Florida, and the Laws of the United States in conformity with the United States and Florida Constitutions.

24. On or about November 26, 1996, It was at this meeting that the removal of HOWARD GARY & COMPANY was again considered.

4

25. Members of The Expressway Authority were, upon information and belief, were motivated to remove the Plaintiff as a result of the "shadow of cloud" which was allegedly associated with HOWARD GARY & COMPANY.

26. The Expressway Authority did not provide the required safeguards of the Administrative Procedures Acts, providing Plaintiff an opportunity to challenge the unlawful removal.

27. On information, and belief, James Burke, his aide, and his co-targets, Carmen Lunetta, then Director of the SEAPORT, Calvin Griggsby, and other persons both on the Commission, and contractors who did work as agents for Miami-Dade County and whose names were mentioned, by the media, as persons who might be indicted wished to smear the PLAINTIFF, so as to damage PLAINTIFF, financially, as retribution, for Plaintiff's cooperation, with the Government and so as to hurt the credibility of employees of PLAINTIFF who might testify in support of the United States Government in future trials.

28. ABRAMS, AGUILA and RAUSCHER cooperated with Burke, and others in smearing Plaintiff in its dealings with Miami-Dade County and for that matter with the other Governmental entities, such as the City of Miami, who expected employees of PLAINTIFF to testify for the government, which, in fact they eventually did.

29. ABRAMS, AGUILA and RAUSCHER benefited financially from cooperating and colluding with Burke and others in denying PLAINTIFF its Civil Rights.

30. The EXPRESSWAY AUTHORITY had no discretion to act arbitrarily or capriciously in removing Plaintiff from the bond issue without just cause or due process. In effect, it convicted HOWARD GARY & COMPANY of wrongdoing when the firm had not been charged with any wrongdoing. Defendants RAUSCHER, AGUILA and ABRAMS benefited from sullying the name of HOWARD GARY & COMPANY.

31. At all times, material hereto, Smith Barney, a large, non-minority, securities firm, was under active legal process, by the Department of Justice and the Securities and Exchange commission for *defrauding* DADE COUNTY in the issuance of its Municipal securities. During the investigation, by the SEC, *they* were not removed from existing and future bond underwritings, by DADE COUNTY, nor The Expressway Authority. After they plead to the fraud and were fined millions of dollars, they were only *briefly* excluded from the list of approved bond underwriters the The Expressway Authority. (Exhibit G)

32. At all times, material hereto, virtually all other non-minority bond underwriters, approved by The Expressway Authority had been under active investigation for misconduct in the underwriting of municipal bonds and other public securities "under a cloud", or in the specific example of Merrill Lynch,

among others, convicted of criminal behavior (Orange County, California). None of those majority firms were excluded from the profession of bond underwriting, by The Expressway Authority. (See Exhibits H & I)

33. The removal of HOWARD GARY & COMPANY from the underwriting team without just cause, was arbitrary and capricious and as a result of racial discrimination.

34. The Expressway Authority had no discretion to act arbitrarily or capriciously in removing HOWARD GARY & COMPANY from the bond issue without just cause or due process. In effect, The Expressway Authority convicted HOWARD GARY & COMPANY of wrongdoing when the firm had not been charged with any wrongdoing. Defendants RAUSCHER and ABRAMS and AGUILA benefited from sullying the name of HOWARD GARY & COMPANY.

35. Further, HOWARD GARY & COMPANY fully and admirably performed all of its obligations to the advantage, enjoyment and prosperity of the Expressway Authority.

36. Pursuant to the terms of the subject contract, as well as the rules governing the Conduct of Municipal Securities Business, HOWARD GARY & COMPANY was obligated to perform its side of the contract. By improperly removing HOWARD GARY & COMPANY from the team, the Expressway Authority subjected HOWARD GARY & COMPANY to potential liability for failure to complete a bond transaction.

37. The Expressway Authority had no discretion to act arbitrarily or capriciously in removing HOWARD GARY & COMPANY from the bond issue without just cause or due process. In effect, the Expressway Authority convicted HOWARD GARY & COMPANY of wrongdoing when the firm had not been charged with any wrongdoing. Further, there was clear evidence that the inclusion of HOWARD GARY & COMPANY on the underwriting team would have no negative economic impact on the bond issue.

38. Despite the work of HOWARD GARY & COMPANY, a minority contractor was removed from the underwriting rotation based on meritless allegations asserted against a principal in the media. No such action bas been taken against non-minority participants even though many were under investigation, indictment and in some instance, confessed judgment or wrongdoing.

39. On October 29, 1996, and in subsequent years, thereafter, the Expressway Authority passed resolutions, which prohibited the Expressway Authority from doing any further business with HOWARD GARY & COMPANY; this was a "de facto" debarment of HOWARD GARY & COMPANY. A resolution by a governmental body directed to a specific company is, by definition, *a bill of attainder.*

40. HOWARD GARY & COMPANY's exclusion violated many of its civil rights, both in terms of motive, and in terms of implementation, to wit; without due process of law, among other violations of its rights.

41. The removal of HOWARD GARY & COMPANY from the underwriting teams without just cause, was arbitrary and capricious and as a result of racial discrimination.

42. HOWARD GARY & COMPANY was suffered grave damages to its business and professional reputation in the community in which it had offered and performed services, and in terms of the huge lost income and profits.

43. Defendants ABRAMS, AGUILA and RAUSCHER are responsible for punitive damages for their conduct in damaging HOWARD GARY & COMPANY.

44. Such losses could have been reasonably anticipated as a result of DADE County's unlawful "debarment" of Plaintiff.

45. All conditions precedent to the bringing and maintaining of this action have occurred or have been waived.

46. The Statute of Limitations, if applicable, would be stayed due to the recent disclosure of certain documents, which are the basis for portions of this suit.

47. As a result of the acts committed by the Defendants herein, HOWARD GARY & COMPANY has retained the services of the undersigned and is obligated to pay a reasonable attorney's fee

<u>COUNT I</u>
<u>EQUAL PROTECTION VIOLATION UNDER FEDERAL CONSTITUTION</u>

48. Plaintiff revears and realleges paragraphs 1 through 47 as though fully set forth herein.

49. Defendants have violated HOWARD GARY & COMPANY's equal rights under the laws of the United States.

50. Specifically, Defendants have denied HOWARD GARY & COMPANY the equal right to enter into and enforce contracts. Despite the fact that all elements for a valid contract being established, Defendant refused to perform the contract if HOWARD GARY & COMPANY remained a part of the team.

51. Specifically, Defendants have denied HOWARD GARY & COMPANY the equal right to enter into and enforce contracts. Despite the fact that all elements for a valid contract being established, Defendant refused to perform the contract if HOWARD GARY & COMPANY remained a part of the team.

52. HOWARD GARY & COMPANY was denied the opportunity to give evidence which would have supported its contractual rights, in that the BOARD voted to cancel the contract only after HOWARD GARY & COMPANY was informed that such action would not take place.

53. HOWARD GARY & COMPANY, as a black minority business entity, was denied the full and equal protection of the all laws and proceedings as enjoyed by non-minority companies.

54. As alleged above, non-minority underwriters who were under a "cloud" or indictment or who had confessed judgment did not have their contracts canceled.

55. HOWARD GARY & COMPANY has been damaged as a result of the actions of the Defendant in that it was prevented from complying with its obligations to deliver under the terms of the contract, and future contracts.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants for punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT II
## DUE PROCESS VIOLATION

56. Plaintiff realleges and reavers paragraphs 1 through 48 as though fully set forth herein.

57. Defendant the Expressway Authority has in place a procedure by which an underwriter may be debarred. That procedure is specifically set forth in the County Code, which is applicable to the Expressway Authority.

58. By passing the resolutions, which prohibited HOWARD GARY & COMPANY from doing any further business with the County, the Expressway Authority caused the "de facto" debarment of HOWARD GARY & COMPANY. This action was based solely upon the fact that HOWARD GARY & COMPANY is a black minority owned business.

59. HOWARD GARY & Company's rights to due process were violated by Defendants actions in failing to follow its own procedures for debarment, consistent with administrative due process.

60. As a result, HOWARD GARY & COMPANY has been denied and deprived of a protected property right, to wit: doing business with the Expressway Authority. This violation amount to a deprivation under the Fourteenth Amendment to the United States Constitution and as guaranteed by the Constitution of the State of Florida.

8

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants for punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

**COUNT III-VIOLATION OF 42 U.S.C. § 1983**

61. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

62. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts. HOWARD GARY & COMPANY further possessed a right to be free from racial discrimination when doing business with the Defendants

63. Defendants, while acting under color of State law, ordinance, regulation, custom and/or usage, subjected HOWARD GARY & COMPANY to or caused HOWARD GARY & COMPANY to be subjected to a deprivation of rights and privileges guaranteed by the Constitution of the United States and the State of Florida to White Persons.

64. Pursuant to the provisions of 42 U.S.C. § 1983 for damages proximately caused, including but not limited to: actual and punitive damages in excess of the jurisdictional limits of this Court; compensatory damages for damage to HOWARD GARY & Company's business reputation; and reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants for punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

**COUNT IV
VIOLATION OF 42 U.S.C. § 1981**

65. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth hereafter.

66. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts. HOWARD GARY & COMPANY further possessed a right to be free from racial discrimination, as a black citizen owned business when doing business with the Defendants.

9

67. Defendant, the Expressway Authority, while acting under color of State law, ordinance, regulation, custom and/or usage, subjected HOWARD GARY & COMPANY to or caused HOWARD GARY & COMPANY to be subjected to a deprivation of rights and privileges guaranteed by the Constitution of the United States and the State of Florida to "White Persons".

68. Pursuant to the provisions of 42 U.S.C. § 1981 for damages proximately caused, including but not limited to: actual and punitive damages in excess of the jurisdictional limits of this Court; compensatory damages for damage to HOWARD GARY & COMPANY's business reputation; and reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants for punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT V-CIVIL RIGHTS UNDER THE UNITED STATES CONSTITUTION CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS

69. HOWARD GARY & COMPANY realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

70. At all times relevant, Defendants ABRAMS and AGUILA were the agents for Defendant, RAUSCHER as Financial Advisor for Defendant the Expressway Authority.

71. Commencing on or about the summer of 1996, ABRAMS, AGUILA and RAUSCHER, while acting under color of state law, in their capacity as Financial Advisor to the Expressway Authority recommended that HOWARD GARY & COMPANY be removed from participation on future and then existing bond issues.

72. As a result of ABRAMS, AGUILA and RAUSCHER's improper actions, Dade County, the Expressway Authority and other County Agencies voted to exclude HOWARD GARY & COMPANY from future work on bond issues.

73. ABRAMS, AGUILA and RAUSCHER conspired with other officials to deprive HOWARD GARY & COMPANY of its constitutionally protected rights.

74. ABRAMS, and AGUILA were motivated to conspire with state officials because they were aware of HOWARD GARY & COMPANY's suspicions of improper conduct on behalf of ABRAMS, AGUILA and RAUSCHER as an underwriter for the City of Miami.

75. ABRAMS and AGUILA were willful participants in a joint action with officials and therefore may be found liable to HOWARD GARY & COMPANY for violations of 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants for punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

**COUNT VI-UNITED STATES CONSTITUTION**
**BIIL OF ATTAINDER**

76. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

77. Defendant DADE in passing the ordinance prohibiting HOWARD GARY & COMPANY from working on further bond issues legislatively determined HOWARD GARY & COMPANY to be guilty of crimes for which it was never even charged.

78. The subject ordinance was specific in that it referred solely to HOWARD GARY & COMPANY, thus creating a Bill of Attainder.

79. Defendant by its Bill of Attainder wrongfully denied HOWARD GARY & COMPANY the fruits of its labor and inflicted upon HOWARD GARY & COMPANY the stigma of being wrongfully removed from bond work within the County.

80. The subject ordinance also worked to effectuate a "de facto" debarment of HOWARD GARY & COMPANY from public contracts. These actions were arbitrary and capricious.

81. HOWARD GARY & COMPANY was denied its full compensation for its participation in the issuance of its bond work and was further denied future it would have attained but for the illegal conduct on behalf of Defendant.

82. Defendant has violated Article 1, Section 9, clause 3 of the United States Constitution by passing and unlawful Bill of Attainder.

83. HOWARD GARY & COMPANY has been damaged as a result of Defendant's improper actions.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT VII
## FLORIDA CONSTITUTION-BILL OF ATTAINDER

84. HOWARD GARY & COMPANY realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

85. Defendant DADE in passing the ordinance prohibiting HOWARD GARY & COMPANY from working on further bond issues legislatively determined HOWARD GARY & COMPANY to be guilty of crimes for which it was never even charged.

86. The subject ordinance was specific in that it referred solely to HOWARD GARY & COMPANY, thus creating a Bill of Attainder.

87. Defendant by its Bill of Attainder wrongfully denied HOWARD GARY & COMPANY the fruits of its labor and inflicted upon HOWARD GARY & COMPANY the stigma of being wrongfully removed from bond work within the Expressway Authority.

88. The subject ordinance also worked to effectuate a "de facto" debarment of HOWARD GARY & COMPANY from public contracts. These actions were arbitrary and capricious.

89. HOWARD GARY & COMPANY was denied its full compensation for its participation in the issuance of its bond work and was further denied future it would have attained but for the illegal conduct on behalf of Defendant.

90. Defendant has violated Article 1, Section 10, of the Constitution of the State of Florida by passing an unlawful Bill of Attainder.

91. HOWARD GARY & COMPANY has been damaged as a result of Defendant's improper actions.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT VIII-BREACH OF CONTRACT

92. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

93. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts.

12

94. Defendant, the Expressway Authority, breached his contractual rights, thereby damaging the company.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

### COUNT IX
### INTENTIONAL INTERFERENCE WITH  BUSINESS RELATIONSHIPS

95. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

96. HOWARD GARY & COMPANY had numerous ongoing relationships with customers, throughout the United States. ABRAMS, AGUILA and RAUSCHER were, at all times material, herein, business competitors of Plaintiff.

97. ABRAMS, AGUILA and RAUSCHER conduct constituted an unlawful interference with HOWARD GARY & COMPANY's advantageous business relationships with municipal issuing agencies, and customers for securities.

98. Plaintiff realleges and reavers paragraphs 1 through 47 as though fully set forth herein.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants ABRAMS, AGUILA and RAUSCHER punitive damages, and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

### COUNT X-COMMERCIAL DEFAMATION

99. ABRAMS, AGUILA and RAUSCHER commercially defamed HOWARD GARY & COMPANY which resulted in HOWARD GARY & COMPANY being held to be unreliable as an underwriter of municipal securities and Financial Advisor to issuing agencies.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants ABRAMS, AGUILA and RAUSCHER for punitive damages, and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

The Plaintiff demands Trial By Jury for all issues so triable.

RICHARD J. BURTON & ASSOCIATES, P.A.
18305 Biscayne Boulevard, Suite 300
Miami, FL 33160
TEL:  (305) 705-0886/FAX: 935-9542

BY:_____
Richard J. Burton, Esquire FBN 179337

# DADE COUNTY EXPRESSWAY AUTHORITY
111 N.W. FIRST STREET, SUITE 2740
MIAMI, FLORIDA 33128
(305) 375-3232
Fax: (305) 375-3253

December 6, 1996

Mr. Howard V. Gary
President & CEO
Howard Gary & Company
3050 Biscayne Boulevard, Suite 603
Miami, Florida 33137-4163

Dear Mr. Gary:

The members of the Dade County Expressway Authority and the undersigned have received several pieces of correspondence from you since the Authority resolved at its meeting on October 29, 1996, to remove Howard Gary & Company from the underwriting team for the proposed issuance of bonds to finance the acquisition of certain Dade County Expressways from the State of Florida. At its meeting on November 26, 1996, the Authority discussed your request for reinstatement as part of its underwriting team and considered the additional information set forth in your correspondence.

I and others at that meeting, expressed the view that the situation regarding you and your firm had not changed significantly from the time that the Authority resolved to remove the firm from the underwriting team. The Authority declined to reconsider its position and directed me to advise you so in writing.

I appreciate your continued interest in the Authority and wish you well in your future endeavors and would be pleased to consider your firm for participation in future Authority financings if circumstances permit.

Sincerely,

Servando M. Parapar, P.E.
Executive Director

cc:   Board Members
      P. Aguila, RPR, Inc.
      B. Giles-Klein, Greenberg Traurig

**PLAINTIFF'S EXHIBIT**

Sonny Holtzman, Chairman     Norman Wartman, Vice-Chairman
Jose Abreu, George J. Berlin, William Delgado, Commissioner Betty Ferguson, Rafael Garcia-Toledo, Mayor Seymour Gelber
Albert Huston, Congressman William Lehman, Carlos A. Penin, Kitty Roedel, Stephen Southerland
Servando M. Parapar, Executive Director

(12/31/1995)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 11/19/1996

**To:** Miami

**From:** Miami
         PC-1
              **Contact:** SA Hubert A. Lane

**Approved By:** Clemens Michael S

**Drafted By:** Lane, Hubert A:bmf

**Case ID #:** 270D-MM-81589 (Pending)
             194B-MM-81345 (Pending)

**Title:** 270D-MM-8627-WC

**Synopsis:** Request for monthly expense payment of $6,200 for captioned source.

**Details:** Captioned Cooperating Witness (CW) acted successfully in a covert role in the "GREEN PALM" undercover operation (UCO). As a result of his successful cooperation, a separate investigation was opened under the title, "JAMES BURKE, METRO DADE COMMISSIONER, MIAMI, FL; CSLPO-LOCAL LEVEL; (OO:  MM)", 194B-MM-81345. Essentially, CW made numerous consensual recordings of conversations with Commissioner BURKE, his aide, BILLY HARDEMON, and San Francisco bond dealer, CALVIN GRIGSBY. These consensual recordings documented a massive bribery scheme in which Grigsby agreed to pay Burke and Hardemon a total of $350,000 in return for their assistance in making Grigsby's firm the senior underwriter in the $160,000,000 refinancing of a Dade County waste recycling bond issue. It is anticipated GRIGSBY, BURKE and HARDEMON will be indicted based primarily on evidence secured by CW. Grigsby is a major bond dealer on a national scale, and it is anticipated this investigation will expand into other alleged areas of corruption in South Florida and other urban areas throughout the United States. It is also noted CW consensually recorded a bribe payment to City Commissioner Miller Dawkins in the GREEN PALM UCO. This evidence was of substantial importance in obtaining a guilty plea from Dawkins in that matter.

        It is noted that since CW's role as an "informant" has been publicly expanded, his bond business, Howard V. Gary, and Associates, has virtually failed. Due to the widespread publicity afforded the GREEN PALM investigation, and CW's role in that case, CW has been blacklisted by every municipality and



PLAINTIFF'S EXHIBIT
B

To: Miami From: Miami
Re: 194B-MM-81345, 11/19/1996

county government with which his firm ~~has~~ had previously done
business. In a meeting with CW and his attorney on 11/7/96, CW
laid-out his financial condition requested assistance from the
FBI. Inasmuch as CW's loss of income derives essentially from
his status as a cooperator, it is requested that a monthly
payment for expenses be made to CW to enable him to sustain
himself in South Florida until such time as his cooperation is no
longer needed. CW is expected to testify extensively as a trial
witness and his availability is essential to the case. CW will
have to devote extensive time to preparation for trial, including
the review and correction of each tape and transcript.

CW has presented documentation to Special Agents (SAs)
Hubert A. Lane and Gary N. Favitta indicating monthly personal
expenses of $10,840.00. His income at the present time is zero.
A close analysis of his monthly expenses discloses a minimum
payment of $6,200 per month will be required to maintain CW at
this time. These expenses are detailed as follows:

| | |
|---|---|
| Mortgage and related expenses: | $ 2,700.00 |
| Automobile, health & life insurance: | 800.00 |
| Monthly utilities: | 650.00 |
| Car payments & gasoline/maintenance: | 900.00 |
| Child care: | 500.00 |
| Groceries: | 650.00 |
| **TOTAL** | **$ 6,200.00** |

Assistant United States Attorney (AUSA) Bruce Udolf has
been briefed on the above, and fully supports this payment.

2



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

99 N.E. 4 Street,  Suite 800
Miami, Florida 33132-2111

October 30, 1996

Mr. Peter Raben, P.A.
1870 South Bayshore Dr.
Coconut Grove, FL 33133

Re: <u>Howard Gary & Co.</u>

Dear Mr. Raben:

This letter is written to respond to your written request, as counsel for Howard Gary & Co., for clarification of the status of the entity, Howard Gary & Co., in a grand jury investigation in this District. This letter confirms that the firm, Howard Gary & Co., is not now a subject or a target of the grand jury's investigation into political corruption in Miami or Metro-Dade County known as Operation Greenpalm.

SINCERELY,

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

By: *Mary Butler*

Mary K. Butler
Assistant United States Attorney



**PLAINTIFF'S EXHIBIT**

C



**Howard Gary & Company**
Investment Bankers & Financial Advisors
3050 Biscayne Boulevard, Suite 603
Miami, Florida 33137-4163
Telephone (305) 571-1380
Telecopier (305) 571-1393

November 15, 1996

Mr. Michael Abrams
Senior Vice President
Rauscher Pierce Refsnes, Inc.
Miami Center
201 S. Biscayne Boulevard
Suite 830
Miami, Florida 33131

Dear Mr. Abrams:

Since Rauscher Pierce Refsnes, Inc. is the financial advisor
to many of Dade County and some of its agencies, we feel
that it is appropriate to share with you the attached letter
from the U.S Department of Justice dated October 30, 1996,
stating that Howard Gary & Company is not a subject or a
target of the grand jury's investigation into political
corruption in Miami or Metro-Dade County which is attached.
This information has been provided to the Finance Department
of Dade County and the Manager's Finance Committee.

Hopefully this will clear up any concern regarding the
status of Howard Gary & Company.

Thank you for your assistance in this matter.

Sincerely,

Howard Gary
President



PLAINTIFF'S
EXHIBIT

D

 **Howard Gary & Company**
Investment Bankers & Financial Advisors
3050 Biscayne Boulevard, Suite 603
Miami, Florida 33137-4163
Telephone (305) 571-1380
Telecopier (305) 571-1393

November 20, 1996

Mr. George J. Berlin
Treasurer and Chairman of the Finance Committee
Dade County Expressway Authority
111 Northwest First Street
Miami, Florida  33128

Dear Mr. Berlin:

Please consider this letter as Howard Gary & Company's
request for reinstatement in the Expressway Authority of
Dade County's upcoming financing.  Our request is based on
the following information: 1) a letter from the U.S.
Department of Justice, 2) the decision of the Dade County
Manager's Finance Committee and 3) the results of the recent
bond issuance by Dade County.

The attached letter from the U.S. Department of Justice,
dated October 30, 1996, confirms that "Howard Gary & Co., is
not now a subject or a target of the grand jury's
investigation into political corruption in Miami or Metro-
Dade County...."

At the last meeting of the Manager's Finance Committee of
Dade County, the issues of disclosure and costs were
discussed as it relates to the participation of our firm in
an upcoming bond financing.  The major and driving issue was
whether our firm's participation would affect the
marketability and price of the bonds.

All of the experienced bankers and attorneys (except for
one), involved in the discussion stated, publicly, that
disclosure or the firm's involvement in bond financings
would not have an adverse affect on the price and
marketability of the bonds.  Both of the County's financial
advisors concurred without reservation that the firm's
participation would not impact the price or investor
interest for the bonds.  The Manager's Finance Committee
voted 7 to 1 in favor of the inclusion of our firm because
it would not adversely affect the price or marketability of
the County's bonds.

Mr. George J. Berlin
Treasurer and Chairman of the Finance Committee
Dade County Expressway Authority
November 21, 1996
Page Two of Two

Additionally, attached is The Bond Buyer article of November
21, 1996, which quotes the Director of Bond Finance for Dade
County as saying that the controversy in Dade County did not
affect the price nor the financial markets reception of Dade
County's bonds.   To the contrary, the reception by the
capital marketplace was excellent thereby enabling Dade
County to reprice its bonds and obtain even greater price
savings.   As with any bond, the issue is the underlying
credit, i.e., does the marketplace perceive the issuer as
having the ability to repay its debt.

Hence, based on the preceding facts, Howard Gary & Company
requests your reconsideration for its participation, as
originally approved, in your upcoming financing.

Thank you for your consideration in this matter.

Sincerely,

Howard V. Gary
President and C.E.O.


cc:  Mr. Sonny Holtzman, Chairman
     Dade County Expressway Authority

     Mr. Michael Abrams, First Vice President
     Rauscher Pierce Refsnes, Inc.

     Bruce Giles-Klein, Esq.
     Greenberg Traurig Hoffman Lipoff Rosen & Quentel, P.A.



PLAINTIFF'S
EXHIBIT
E



# FINANCING ALTERNATIVE CONSIDERATIONS

## FOR THE CITY OF MIAMI

### JUNE 14, 1995





FOIA Confidential Treatment Requested. Contact Samuel
J. Winer, Foley & Lardner, 3000 K Street, NW, Suite
500, Washington, DC 20007 (202) 672-5300

RPRM 000992

FINANCING ALTERNATIVE CONSIDERATIONS
FOR THE CITY OF MIAMI

JUNE 14, 1995

We believe it is important to review the features of a number of financing alternatives being considered by the City of Miami.

The review is intended to determine whether each alternative achieves the expected impact on the City, both for the next budget year and for future budget years, as well. In addition, the reaction of capital market participants, specifically bond insurers and rating agencies, is fundamental to the viability of any financing option.

A summary of the financing options considered most recently are as follows:

**Pension Payment Deferral** - $25 million before October 1, 1995 and $35 million thereafter.

These financings would be considered operating budget deficit financings and would be received negatively by rating agencies, credit enhancers, and bond investors.

Their completion will raise credit concerns and likely carry a credit risk cost premium, either imbedded in the insurance premium or interest rate.

It is possible this borrowing could be construed as a general working capital borrowing and be subject to lower tax-exempt interest rates instead of taxable pension bond rates. This is a bond counsel research question.

The budget benefit is immediate in the first year, but is negative in all later years the bonds remain outstanding.

**Pension Deposit for Gates Liability** - Under $100 million, although $114 million satisfies the entire Gates liability.

This approach is a blend of achieving present value savings on bonds sold to finance the deposit compared with unfinanced deposits together with deferral of payment budget benefits.

This financing will likely be acceptable to credit enhancers and credit rating agencies because of the present value savings. However, they will be negative to the deferral component. But, on balance, the financing should be acceptable.

The budget relief is relatively small in comparison to the full deferral under the first alternative. Borrowed funds are deposited for the Gates liability and not directly used for budget relief.

Future years budgets are negatively impacted, but not as severely as the full deferral option.

503.F019.fusopus

PPRI1 000993

FOIA Confidential Treatment Requested. Contact Samuel J. Winer, Foley & Lardner, 3000 K Street, NW, Suite 500, Washington, DC 20007 (202) 672-5300

## Deficit Financing Notes

These notes are viewed negatively by the capital markets, but less so than long-term financing for correction of a current budget shortfall.

These notes have the benefit of a low cost of funds - both short and the short end of the tax-exempt yield curve.

The notes should be credit enhanced, probably by a bank letter of credit.

This instrument is a deferral of the budget problem from one year to the next. So, in essence, it buys one year's time.

## Convention Center Parking

This financing is conceptually similar to financing the Gates liability for the GESE pension fund.

The structure can create budget relief of approximately $3.5 million initially with modest negative impact the next several years.

The present value savings is an attraction of this financing.

## Employee Compensated Absence Borrowing - $43 million.

This financing should be viewed as creating a fund from which the past unused employee compensated absence benefits can be paid. If the proceeds are used directly for operating expenses, the City's liability will, in essence, be doubled and the financing would be a pure deficit financing having the previously described negative market reaction.

503 F019 fusepu

FOIA Confidential Treatment Requested. Contact Samuel J. Winer. Foley & Lardner. 3000 K Street, NW, Suite 500. Washington, DC 20007 (202) 672-5300

RPRM 000994

| | Financing Characterization | | Use of Funds | | Tax Status | | Budget Impact | | Revenue Source |
|---|---|---|---|---|---|---|---|---|---|
| | Deficit Financing | Combination Deficit Financing With Present Value Savings | Restricted | Unrestricted | Taxable | Tax-Exempt | 95/96 | Beyond | |
| Pension Payment Deferral | X | | X | | X (1) | | Positive | Negative | Non ad valorem revenues |
| Pension Deposit for Model Year Gates I Liability | | X | X | | X | | Positive | Negative | Non ad valorem revenues |
| Deficit Financing Notes | X | | | X | | X | Positive | Negative | Non ad valorem revenues |
| Constrained Center | | X | | X | | X | Positive | Minimally Negative | Project revenues, public service tax, general budget covenant, MBIA insured |
| Employee Compensated Absence Borrowing | | ? | x | (1) | | X (3) | Not Quantified (4) | Not Quantified (4) | Probably non ad valorem revenues |

NOTES:

(1) Unless this amount is restricted to be used for employee benefits, it should be construed as deficit financing. The actual employee benefit liability would be doubled if proceeds are spent for general budget expenditures.

(2) This may be tax-exempt if it is construed as a general governmental working capital borrowing and not a deposit for investment in the pension fund.

(3) May require legal tax research because use is not typical capital purpose.

(4) Assuming proceeds are restricted for use to fund already accrued but unused employee compensated absence. The benefit will be the difference between the absence used and compensated for from the fund established and the debt service on the bonds issued to establish the fund.

FOIA Confidential Treatment Requested. Contact Samuel J. Winer. Foley & Lardner. 3000 K Street, NW. Suite 500. Washington. DC 20007 (202) 672-5300

RPRM 000995



08/14/93   16:09   ☎813 957 1525        RAUSCHER PIERCE                    ☎001

```
                        ●●●●●●●●●●●●●●●●●●●●●●●●●●
                        ●●●    ACTIVITY REPORT    ●●●
                        ●●●●●●●●●●●●●●●●●●●●●●●●●●

    TRANSMISSION OK

    TX/RX NO.              2580
    CONNECTION TEL                    1 305 577 4838
    CONNECTION ID         RAUSCHER PIERCE
    START TIME            08/14 16:06
    USAGE TIME           03'00
    PAGES                     6
    RESULT               OK
```

RPRM 000997

FOIA Confidential Treatment Requested, Contact Samuel
J. Winer, Foley & Lardner, 3000 K Street, NW, Suite
500, Washington, DC 20007 (202) 672-5300

| Credit Enhancement | | Rating Agency Reaction | | Financing Terms | | | | | | |
| | | Positive | Negative | Repayment Term | | Call Option | | Interest Rate | | |
| | | | | Short-Term | Long-Term | Short | Typical 10-Year | Short-Term | Variable | Fixed Long-Term |
| Pension Payment Deferral | Required - deficit financing feature is negative | | X | | X | | X | | Partial is optional | X |
| Pension Deposit for Multi-Year Gains Liability | Required (bond insurance) | Will like savings | Negative regarding deferral component | | X | | X | | Partial is optional | X |
| Deficit Financing Notes | Required (Bank LOC) | X | X | X | | X or none | | X | | |
| Conversion Center | Not required - carry forward MBIA is desirable | Will like savings | Negative regarding deferral component | | X | | X | | | |
| Employee Compensated Absence Borrowing | Likely required | Probably neutral | | | X | | X | | X or | X |

FOIA Confidential Treatment Requested. Contact Samuel J. Winer, Foley & Lardner, 3000 K Street, NW, Suite 500, Washington, DC 20007 (202) 672-5300

RPRM 000996

**Howard Gary & Company**
Investment Bankers & Financial Advisors

3050 Biscayne Boulevard · Suite 603
Miami, Florida 33137-4163
(305) 571-1390 · Fax (305) 571-1393

**RAYMOND JAMES**
& ASSOCIATES, INC.

880 Carillon Parkway
St. Petersburg, Florida 33716-1100
(813) 573-8189 · Fax (813) 573-8315
(800) 248-8863 · Ext. 2883

EXHIBIT
Δx 81 I

September 30, 1994

### PRIVILEGED AND CONFIDENTIAL

Carlos E. Garcia, CPA
Director
Department of Finance
City of Miami, Florida
300 Biscayne Boulevard Way, Suite 210
Miami, Florida 33131

Dear Mr. Garcia:

Since 1988, it has been our privilege to serve The City of Miami, Florida (the "City") as its Financial Advisors. As the City's Financial Advisors, we have certain fiduciary and ethical duties and responsibilities to the City. During this period of time, we have on numerous occasions expressed our concerns regarding the City's deteriorating fiscal condition.

The City's issuance of $18,000,000 Special Non-Ad Valorem Revenue Bonds to finance a self-insurance claims reserve fund for the payment of liability settlements or judgements against the City for the next two (2) fiscal years, in conjunction with the City's Fiscal Year 1994/1995 Budget are particular sources of concern. Other continuing concerns include the low level of unreserved general fund balances; the City's reliance on non-recurring revenue initiatives; asset sales; basic infrastructure maintenance needs; as well as the City's overall revenue inflexibility.

Based on our long and well established relationships with various Managers and Analysts at Moody's Investors Service, Inc. ("Moody's) and Standard & Poor's Corporation ("S&P"), we have ascertained that the City's general credit rating will experience a downgrade in the near future.

It should be noted that City Manager Odio, in conjunction with the City's the Department of Finance, as well as the Department of Management and Budget, under the leadership and guidance of yourself and Assistant City Manager Surana, respectively, have done an exemplary job of maintaining and avoiding major downgrades of the City's general credit

PLAINTIFF'S
EXHIBIT
F

EXHIBIT
Parekh
11

Members NASD, MSRB, SIPC

HG S 00023

Carlos E. Garcia, CPA
Director
Department of Finance
City of Miami, Florida
September 30, 1994
Page Two of Two

rating during a significant restructuring of the South Florida economy; the effects of a national recession; and the single largest natural disaster in the history of the United States. This fact has been consistently recognized by both Moody's and S&P.

We look forward to meeting with you to discuss our concerns in-depth and to formulate a pro-active strategy to address these concerns with the City. As always, please do not hesitate to contact the undersigned at (305) 571-1380, should you have any questions.

Sincerely,

HOWARD GARY & COMPANY          RAYMOND JAMES & ASSOCIATES, INC.

Kishor M. Parekh              Wendell G. Gaertner
First Vice President          Vice President - Public Finance

HG S 00024

**THE SCHOOL BOARD OF ORANGE COUNTY**                                November 12, 1996
*Proposal to Serve as Underwriter*                                                  Page 26

9.4     *With regard to activities of your firm involving investment banking, underwriting, trading or investment advice*
        *(excluding routine retail brokerage matters) provide information covering the past three years describing (1) any*
        *litigation or court proceeding in which a settlement was entered into, or fine levied, or sanction imposed by a court*
        *or federal or state regulatory or administrative agency, or (2) any currently pending investigation, litigation or*
        *proceeding by state or federal agency. Please be specific and thorough in responding to this question.*

As one of the largest financial services companies in the world, with approximately 10,500 registered sales representatives located
in over 400 offices in the United States alone,  Smith Barney maintains regular and ongoing contact with the Securities and
Exchange Commission ("SEC"), various state regulators, and administrative agencies and is often asked to provide information,
documents or testimony in connection with investigations or proceedings conducted by those bodies.  To the best of our
knowledge, Smith Barney is not currently nor has been during the past three (3) years the subject of any material
enforcement or disciplinary proceeding or is a defendant in any criminal proceeding. However, there can be no assurances
that some action may not be undertaken by a regulatory body in the future.

With respect to regulatory matters relating to Smith Barney's Public Finance Department, we are aware of the following ongoing
investigations, none of which have charged any wrongdoing on the part of Smith Barney:

        (a)     The Los Angeles Regional Office of the Securities and Exchange Commission ("SEC") is conducting an
                investigation into the well-publicized default by Orange County, CA and its related entities.  Smith Barney,
                along with many firms, has received and responded to subpoenas seeking information relating to both
                underwriting and trading of various Orange County securities.

        (b)     The SEC is conducting one or more wideranging investigations into various practices in the municipal finance
                business generally, including reinvestment and escrow pricing ("yield burning") and the process by which
                underwriters are selected. These investigations have included subpoenas and requests for information from the
                SEC to a number of issuers and participants in many different transactions, including some in which Smith
                Barney participated as underwriter or otherwise.

        (c)     The Miami office of the SEC has been examining the 1994 Dade County Water and Sewer Authority bond
                offering in which Smith Barney and Howard Gary & Co served as co-senior managers. The SEC has asked for
                information on the use of swaps as part of this and other financings but appears to be focussing on the savings
                presentation made to the County and on the manner in which Smith Barney was compensated by the swap
                provider for acting as swap agent in this financing.

        (d)     The Washington office of the SEC has also requested information relating to swaps and is specifically reviewing
                a swap transaction involving Los Angeles County in which Smith Barney acted as underwriter and as swap
                agent.



        (e)     The Antitrust Division of the U.S. Department of Justice has commenced an investigation into an alleged
                boycott by institutional investors of debt issued by the State of Illinois.  The "boycott" was allegedly
                commenced when the state legislature repealed laws which had been enacted to subsidize the income generated
                by waste disposal facilities built in Illinois. The repeal caused certain facilities to default or restructure their
                debt. Smith Barney was an underwriter of one of those facilities and has been asked to provide documents and
                information to the Department of Justice to assist in its inquiry. No allegations of wrongdoing have been made
                against Smith Barney or any institutional investor.

As noted, in none of these matters has Smith Barney been charged with any wrongdoing.   However, there can be no assurances
that some action may not be undertaken by a regulatory body in the future.  Smith Barney is cooperating fully with the SEC in
each of its investigations.

With regard to litigation related to Smith Barney's activities as an underwriter of municipal securities, this firm, along with
virtually every other firm which underwrote securities for or sold securities to Orange County and/or its related entities, is a
defendant in the pending class action lawsuit arising out of the firm's underwriting of debt issues by participants in the Orange
County Investment Pool in 1993-94 as well as the Investment Pool's periodic trading through Smith Barney of repurchase and
reverse repurchase agreements. The plaintiff bondholders allege that all of the firms that underwrote securities for Orange County

FROM : ＝＝＝＝＝ PHONE NO. : Oct. 11 2000 11:13AM P6

or Pool participants during a specified time period failed to disclose material information about Orange County's investment practices and that all the firms which engaged in transactions involving derivative securities did so in violation of their fiduciary duty and various federal and state laws. A tentative settlement has been reached by the parties to this litigation and is now awaiting approval by the court.

In the summer of 1995, Cuyahoga County, Ohio filed civil suit against Smith Barney, five other brokerage firms and one bank alleging that each helped facilitate the County's allegedly improper investments in "high volume, speculative transactions" involving repurchase agreements, floaters and other derivatives. While the County claims damages in excess of $100 million, it has not alleged, nor is it readily ascertainable, what portion of those losses are allegedly attributable to the relatively small amount of trading which was done with Smith Barney. In any event, Smith Barney does not believe it's conduct was improper in any way and is taking appropriate action to vindicate its position in the courts.

The following material regulatory matters involving Smith Barney but which did not involve and are unrelated to Smith Barney's Public Finance Department have been concluded within the past three (3) years:

a)    On July 17, 1996, Smith Barney entered into a Stipulation and Order to resolve a civil complaint filed by the United States Department of Justice alleging that Smith Barney and 23 other NASDAQ market makers violated the Sherman Act in connection with certain market-making practices. Pursuant to the settlement, which is subject to court approval, the parties neither admitted nor denied the allegations. The parties agreed that they would not engage in certain activities in the future and undertook to implement certain procedures to assure compliance with that agreement. In connection with this matter, the General Counsel of the SEC provided an opinion stating that the settlement is not a disqualifying event under relevant provisions of the securities laws.

b)    In connection with the SEC's investigation of the primary distribution of U. S. Treasury notes and unsecured debt securities issued by government sponsored enterprises ("GSE's), which investigation emanated from disclosure of activities of a large primary dealer in U. S. Treasury auctions (Salomon Brothers), Smith Barney, in order to settle that aspect of the SEC's investigation relating to GSE securities and without admitting or denying liability, consented in December 1993 to the entry of an order by the SEC that Smith Barney violated Section 17(a) of the Exchange Act and 17 C.F.R. Sections 240.17a-3 and 240.17a-4 for failure to maintain accurate books and records in connection with the primary distribution of GSE unsecured debt securities. Ninety-eight other institutions entered into similar settlements with the SEC.

c)    On January 18, 1994, a NYSE Hearing Panel accepted Smith Barney's Stipulation of Facts and Consent to Penalty whereby the Firm, without admitting or denying guilt, consented to a finding that:

1.    It violated NYSE Rule 345.17(b) in that on one or more occasions it failed to timely file with the Exchange amendments to Form U-5;

2.    It violated Exchange Rule 351(a) in that on one or more occasions it did not promptly report to the Exchange a matter as required by the rule;

3.    The Firm violated Exchange Rule 342(a) and (b) in that it failed to provide for, establish and maintain appropriate procedures of supervision and control, including a separate system of follow-up and review, with respect to its obligation to promptly report to the Exchange matters as required by Exchange Rules.

d)    On January 26, 1995, the Hong Kong Securities and Futures Commission ("Commission") publicly reprimanded Smith Barney Shearson (Hong Kong) Limited ("Limited") for a series of breaches of the registration requirements of Hong Kong's Securities Ordinance and Commodities Trading Ordinance. The commission accepted Limited's offer voluntarily to suspend its retail operation in Hong Kong for a period of 10 days. The suspension took effect on January 30, 1995. Limited is a subsidiary of Smith Barney Inc. The Commission took into account the fact that Limited cooperated fully with the Commission's inquiry and has taken immediate steps to rectify the breaches identified. The Commission also took into account the fact that Limited's clients had suffered no loss as a result of its conduct.

 **Municipal Securities Group**

*9.4  With regard to activities of your firm involving investment banking, underwriting, trading or investment advice (excluding routine retail brokerage matters) provide information covering the past three years describing (1) any litigation or court proceeding in which a settlement was entered into, or fine levied, or sanction imposed by a court or federal or state regulatory or administrative agency, or (2) any currently pending investigation, litigation or proceeding by state or federal agency. Please be specific and thorough in responding to this question.*

Not unlike most securities firms, PaineWebber Incorporated is and has been a defendant in numerous legal actions relating to its securities and commodities business that allege various violations of federal and state securities laws including allegations of fraud, misrepresentation and/or breach of fiduciary duty which have resulted in civil or monetary liability being assessed against PaineWebber and/or its employees. Our parent, PaineWebber Group, Inc. ("PWG"), is a public company (PWG stock is listed on the NYSE) and regularly reports on Forms 10K and 10Q to the Securities and Exchange Commission ("SEC") and the NYSE regarding pending material litigation, including administrative proceedings. These reports are publicly available and include information about PaineWebber matters.

PaineWebber, like most large, full service investment banks and broker-dealers, is subject to inquiries by the SEC, NYSE and various other regulatory organizations. Recently, the SEC has undertaken a broad-based investigation of the municipal securities industry and, in connection therewith, PaineWebber and other large firms have been asked to provide information. PaineWebber is fully cooperating with the authorities in all such requests.

PaineWebber announced on January 18, 1996, a series of actions that together constitute a comprehensive resolution of issues related to PaineWebber's sale of public proprietary limited partnerships in the 1980s and early 1990s. PaineWebber agreed to: (a) without admitting or denying the SEC's findings, the settlement of civil and administrative proceedings by the SEC through the entry of an order which imposes a censure, a cease and desist order, a civil monetary penalty and various remedial sanctions; (b) the settlement of pending class actions for cash and other non-cash considerations, subject to court approval; and (c) a settlement with various state securities administrators, which include cash payments. Since the original announcement, settlement orders have been entered into with nearly all 50 states, the District of Columbia and the Commonwealth of Puerto Rico and preliminary court approval has been granted for the class action settlements.

On July 16, 1996, PaineWebber entered into a Stipulation and Order to resolve a civil complaint filed by the United States Department of Justice, alleging that PaineWebber and 23 other NASDAQ market makers violated Section I of the Sherman Act in connection with certain market making practices. In entering into the Stipulation and Order, without admitting the allegations, the parties agreed that the defendants would not engage in certain types of market making activities and the defendants undertook specified steps to assure compliance with their agreement. The Stipulation and Order are subject to approval by the United States District Court for the Southern District of New York following a public hearing, and if that court approves the Stipulation and Order, the complaint will be dismissed with prejudice.



**PaineWebber Incorporated**

9.2    *Provide a statement certifying that the Proposer meets the minimum criteria as outlined within Section 4 above.*

Prudential Securities certifies that it has met the minimum criteria as outlined within Section 4.

9.3    *Does your firm have any agreement or understanding (verbal or written) with any individual (other than full-time employees) or entity (including law firms) with respect to any compensation, fees or profit received from or in relation to acting as an underwriter for the District? If so, provide a copy of any contract relating to the arrangement (or describe the understanding) and describe in detail the nature of the arrangement and the manner in which contracted fees would be shared or paid.*

Prudential Securitiesdoes not have any agreement or understanding with any individual or entity with respect to any compensation, fees or profit received from or in relation to acting as an underwriter for the District.



9.4    *With regard to activities of your firm involving investment banking, underwriting, trading or investment advice (excluding routine retail brokerage matters) provide information covering the past three years describing (1) any litigation or court proceeding in which a settlement was entered into, or fine levied, or sanction imposed by a court or federal or state regulatory or administrative agency, or (2) any currently pending investigation, litigation or proceeding by state of federal agency. Please be specific and thorough in responding to this question.*

Prudential Securities Incorporated ("PSI"), its officers or employees or its predecessors have been and are involved in various types of litigations, proceedings and other events in which various allegations, including fraudulent conduct, have been made. On October 21, 1993, PSI entered into an omnibus settlement with the SEC and the NASD and an agreement in principal with state securities regulators in 51 jurisdictions (49 states, the District of Columbia and Puerto Rico) to resolve allegations that had been asserted against PSI with respect to the sale of interests in more than 700 limited partnerships generated by PSI's Direct Investment Group and sold from January 1, 1980 through December 31, 1990. Since October 1993, PSI has finalized the settlements with all 52 jurisdictions. The partnerships principally involved real estate, oil and gas producing properties and aircraft leasing ventures. The allegations against PSI were set forth in a complaint filed by the SEC on October 21, 1993 and in an Administrative Order issued by the SEC also on October 21, 1993. It was alleged that federal and state securities laws had been violated through sales of the limited partnership interests (and a limited number of certain other securities) to persons for whom such securities were not suitable in light of their investment objectives, financial status, or investment sophistication. It was also alleged that the safety, potential returns and liquidity of the investments had been misrepresented. PSI neither admitted nor denied the allegations asserted against it. In its opinion, PSI does not consider its ability impaired to do business in full compliance with the applicable laws, rules and regulations.

On October 27, 1994, PSI entered into an agreement with the office of the United State Attorney for the Southern District of New York (the "U.S. Attorney") pursuant to which the U.S. Attorney agreed not to pursue criminal charges against PSI relating to PSI's sale of the Prudential-Bache Energy Income Fund oil and gas limited partnerships ("the "Income Funds"), provided that PSI complies with certain conditions for a period of three years. Pursuant to the agreement, in the event PSI fails to comply with the conditions which include an independent monitor of the firm's compliance activities, the United States Attorney will be permitted to pursue criminal charges against PSI relating to its sale of the Income Funds.

From August 1995 through December 1995, PSI voluntarily provided documents requested by the SEC relating to PSI's involvement in advanced municipal refundings where PSI was the provider of the escrow securities. Our understanding is that PSI was one of a number of broker/dealers to have been requested to respond to this inquiry.

In May 1996, the Philadelphia District Office of the SEC subpoenaed certain documents from *PSI* concerning the sale of escrow securities by PSI to the Commonwealth of Pennsylvania in connection with a 1993 certificate of participation issuance.  PSI is in the process of complying with the SEC's requests in this matter.

In addition, PSI, its Public Finance Department, and other employees are sometimes asked to provide information in connection with inquiries and ongoing regulatory reviews by state, federal and industry regulatory or investigative agencies.  PSI is committed to doing business in full compliance with the applicable rules and regulations.

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## 00-4134
## CIV-LENARD

### I (a) PLAINTIFFS
M Securities Investment
Inc/ Howard Gary & Company

### DEFENDANTS
Miami-Dade County Expressway
Authority, Michael Abrams, Levy of Aguila, JR.
Dien Rackhter, Inc F/K/a
Retires phic.

### MAGISTRATE JUDGE
### TURNOFF

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Miami Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Miami Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

A.dade (00CV 4034 Lenard) Turnoff

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Richard J Burton & Assoc. P.A.
18305 Biscayne Blvd # 300
Aventura Fl. 33160

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLANTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
42 USC 1981  42 USC 1983- Denial of Civil Rights
Bill of Attainder

IVa.  **15** days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| A CONTRACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  | B ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 780 Other Labor Litigation | **A FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☒ 444 Welfare |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | **B PRISONER PETITIONS** |  | ★ ☐ 690 Other Statutory Actions |
| B ☐ 290 All Other Real Property |  | ☐ 510 Motions to Vacate Sentence Habeas Corpus: |  | ★ A or B |
|  |  | ☐ 530 General |  |  |
|  |  | ☐ 535 Death Penalty |  |  |
|  |  | B ☐ 540 Mandamus & Other |  |  |
|  |  | ☐ 550 Civil Rights |  |  |
|  |  | A or B |  |  |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  Oct 20 2000

SIGNATURE OF ATTORNEY OF RECORD

FBN 179337

UNITED STATES DISTRICT COURT
S/F I-2
PPV 6/90

FOR OFFICE USE ONLY: Receipt No. 830442   Amount: 150.00

Date Paid: 10/24/00   M/ifp: